UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID LAMBERT,

          Plaintiff,

vs.                                        CASE NO.:  6:15-cv-78-Orl-18DAB

SEMINOLE COUNTY SCHOOL BOARD,
a Florida Governmental entity,

          Defendant.

_____/

**DEFENDANT, SEMINOLE COUNTY SCHOOL BOARD'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I OF THE COMPLAINT (DE 22)**

Defendant, SEMINOLE COUNTY SCHOOL BOARD, a Florida governmental entity ("School Board"), responds to Plaintiff, David Lambert's, Motion for Summary Judgment as to Count I of the Complaint and Incorporated Memorandum of Law (DE 22), as follows:

In his Motion for Summary Judgment, Plaintiff argues that the School Board is liable to him in damages for alleged violations of the Telephone Consumer Protection Act of 1991.[1]  Plaintiff asserts multiple avenues for finding liability which, out of an abundance of caution, will be addressed herein.  However, there is no basis for any finding of liability on the part of the School Board under the TCPA for one simple reason – the TCPA was never meant to, and by it's clear terms does not, apply to School Boards or other governmental entities.  Receiving calls from governmental entities with important information is not the type of harm from which Congress was attempting to shield consumers when it enacted the TCPA.

Even if the TCPA did apply to governmental entities such as the School Board, in Florida School Boards are arms of the State and therefore entitled to Eleventh Amendment immunity from suit in federal courts.  Additionally, the CALLplus+ Substitute Management System utilized to place the calls at issue in this case does not fit the definition of an "automatic telephone dialing

_____

[1] 47 U.S.C. § 227.

system", nor does the system use an artificial voice or place prerecorded voice message calls. Thus, there is no basis for imposing liability under the TCPA upon the School Board in this case.

Finally, even if this Court were to find that the School Board is entitled to damages in this case, the amount of which, if any, is disputed, there is no record evidence that the School Board willfully or knowingly violated the TCPA, and enhancement of damages is also unavailable.

## I. THE TCPA DOES NOT APPLY TO GOVERNMENTAL ENTITIES

The TCPA was codified as an amendment to, and remains a part of, the Communications Act.[2] Accordingly, where the TCPA does not provide an alternative definition, the definitions provided by the Communications Act of which it is a part control. The TCPA specifically designates who may be liable for a violation of its provisions as follows:

> It shall be unlawful for any **person** within the United States, or any **person** outside the United States if the recipient is within the United States…

47 U.S.C. § 227(b)(1) (emphasis supplied). The term "person" is not defined within the TCPA. However, the Communications Act defines "person" as an "individual, partnership, association, joint-stock company, trust or corporation." 47 U.S.C. § 153(39). Federal, state, and local governmental entities are not "individual[s], partnership[s], association[s], joint-stock compan[ies], trust[s] or corporation[s]," and therefore fall outside this definition.[3] The United States Supreme

---

[2] 47 U.S.C. Ch. 5.

[3] Indeed, multiple courts have indicated that when Congress defines "person" to include "any individual, partnership, association, joint-stock company, trust or corporation," such language excludes municipal governments and other local governmental entities. *See, e.g., Walden v. City of Providence*, 596 F.3d 38, 60 n.29 (1st Cir. 2010) (finding that 18 U.S.C. § 2510(6) "clearly exclude[s] municipalities from the definition of persons"); *Abbot v. Village of Winthrop Harbor*, 205 F.3d 976, 980 (7th Cir. 2000), *cert. denied*, 528 U.S. 985 (1999) (finding that 18 U.S.C. § 2510(6) "unequivocally excludes local governmental entities from [the statute's] definition of person"); *United States v. Rancho Palos Verdes*, 841 F.2d 329, 331 (9th Cir. 1988) (holding that the definition of "person" in 16 U.S.C. § 1532(13) excludes municipal corporations).

The courts' findings in these cases do not extend to state or federal entities because the definitions of "person" in 18 U.S.C. § 2510(6) and 16 U.S.C. 11532(13) explicitly include federal and state entities in addition to any "individual, partnership, association, joint stock company, trust or corporation." However, the definition of "person" in the Communications Act does not. It is apparent that the drafters of the Communications Act looked to these and other statutes, including the Dictionary Act, 1 U.S.C. § 1, as models in drafting the definition of "person" in the Communications Act, since the language there is mirrored word-for-word in these other statutes. It is particularly

Court has stated that "[i]n common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) (quoting *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979) (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941))) (alteration in original). *See also* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise…the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals…"). *See also* 1 U.S.C. § 1. In *Will*, the Court found that a state and state officials acting in their official capacities were not "persons" under 42 U.S.C. § 1983. *See generally id*.

Even where the term "person" is left undefined, the default rule is that it is construed to exclude governmental entities absent an "affirmative contrary showing" of Congress' intent to include them.[4] Because there is no "affirmative contrary showing" that Congress intended "person" to include the sovereign here – and instead a Congressional choice to define "person" in the Communications Act in a manner the specifically excludes federal, state, and local governmental entities – the term "person" in the TCPA must be construed to exclude the government and governmental officials at the federal, state, and local levels.[5] As discussed in more detail below, in the State of Florida, school districts are constitutionally created governmental entities and arms of the State.[6] In fact, describes the School Board as such in the style of the Complaint. They are not,

---

indicative of the intent of the drafters, then, that the additional language regarding governmental entities was left out of 47 U.S.C. 153(39).

[4] *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 870, 874 (D.C. Cir. 1999) (citing *International Primate Protection League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 83 (1991)).
[5] Nor do the FCC's rules implementing the TCPA, which apply to a "person or entity," 47 C.F.R. § 64.1200, include federal, state and local governmental entities. As an initial matter, the TCPA's plain language demonstrates that the TCPA does not apply to governmental entities, and therefore nor do the Commission's TCPA rules. Moreover, in another context, the Commission has made clear that the addition of the term "entity" in Commission rules did not demonstrate an intention to expand the scope of the application of the rule beyond the definition of "person" in Section 153 of the Communications Act. *See Rules and Regulations Implementing the Truth in Caller ID Act of 2009*, Report and Order, 26 FCC Rcd 9114, 921 para. 16 n.39 (2011).
[6] Florida's school districts are created pursuant to Article IX, Section 4(a) of the Florida Constitution.

therefore, included in the definition of "person" applicable to the TCPA, and are not subject to civil liability under the TCPA. Plaintiff's motion should accordingly be denied, and judgment entered in favor of Defendant School Board as to this entire action.

## II. THIS ACTION IS BARRED BY THE ELEVENTH AMENDMENT

That the TCPA by its clear terms does not apply to governmental entities such as school districts is basis enough standing alone to mandate denial of Plaintiff's motion on all asserted grounds, and entry of summary judgment in favor of the School District. However, even if the School Board did constitute a "person" for purposes of liability under the act, it is immune from suit in federal courts pursuant to the Eleventh Amendment..

The Eleventh Amendment to the Constitution of the United States provides that:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the Unites States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

While the amendment does not specifically reference suits brought against a state by its own citizens, the Supreme Court of the United States has consistently held that an unconsenting state is immune from suits brought in federal courts by her own citizens as well as the citizens of another state. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (citiations omitted). "It is also well established that even though a state is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment." *Id.* at 663.

The analysis in the instant case is similar to that undertaken in *Grimshaw v. South Florida Water Management District*, 195 F. Supp. 2d 1358 (S.D. Fla. 2002). In *Grimshaw*, an employee of the South Florida Water Management District sued the district alleging age discrimination and retaliation pursuant to the Age Discrimination in Employment Act of 1967. *Grimshaw*, 195 F. Supp. 2d at 1361. The district asserted Eleventh Amendment immunity. *Id.* The court explained

that "[i]n deciding whether a state instrumentality may invoke the state's immunity, the inquiry focuses on the nature of the entity created by State law in order to determine whether it should be treated as an arm of the state." *Id.* at 362. In determining that the district was entitled to Eleventh Amendment immunity, the *Grimshaw* court looked at how State law defined the district, the degree of control the State maintained over it, the State's contribution to its funding, and whether State funds would be used to pay a judgment against it. *Id.* at 362-63. The court noted that, like the School District in the instant case, the Water Management District was constitutionally created,[7] is funded by a blend of State appropriations and local funds collected within the district,[8] is empowered to levy ad valorem taxes within the district,[9] and that by virtue of the nature of its funding, state funds would go to pay a judgment against it.[10] Additionally, like the School District, the Water Management District is governed by an extensive State statutory scheme.[11]

Florida's school districts are constitutionally created arms of the State. Article IX, Section 1(a) of The Constitution of the State of Florida provides that "[t]he education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders…" Florida's 67 School Districts were thus created to serve the State function of providing this constitutionally mandated service at a more local level, geographically co-extensive with Florida's 67 counties. *See* Art. IX § 4(a). School Boards are empowered and mandated under Florida's Constitution to "operate, control and supervise all free public schools within the school district and determine the rate of school district taxes" which supplement State funding. *See* Art. IX § 4(b).

---

[7] *Grimshaw*, 195 F. Supp. 2d at 1363.
[8] *Id.* at 1366-67.
[9] *Id.* at 1367.
[10] *Id.* at 1367-68.
[11] *Id.* at 1360, 1366.

It is particularly noteworthy that Florida's School Districts are not created pursuant to Article VIII of Florida's Constitution, titled "Local Government," under which Florida's Counties are established and Municipalities are authorized. Florida's School Districts are instead established under their own Article IX titled "Education" in a manner clearly expressing their intended purpose to carry out on a more local level the State's constitutionally mandated function of providing the citizens of the State with public education. Florida's legislature has clearly expressed that the purpose of the School Districts is to carry out the State's function of providing public education to its citizens. Section 1001.32(1) of the Florida Statutes, titled "District System" provides that "[t]he district school system shall be considered as a part of the state system of public education." In Florida Statutes § 1000.03(3), Florida's legislature explains that

> Public education is a cooperative function of the state and local education authorities. The state retains responsibility for establishing a system of public education through laws, standards, and rules to assure efficient operation of a K-20 system of public education and adequate educational opportunities for all individuals. Local educational authorities have a duty to fully and faithfully comply with state laws, standards, and rules and to efficiently use the resources available to them to assist the state in allowing adequate educational opportunities.

Florida's State education system, including its School Districts, are governed by Title XLVIII of the Florida Statues, Chapters 1000-1013, titled "K-20 Education Code." Florida's K-20 Education Code sets forth an extensive system of State law designed to effectuate and maintain uniformity of the State's constitutional mandate regarding the provision of public education to the citizens of the State:

> PURPOSE.--The purpose of the Florida K-20 Education Code is to provide by law for a state system of schools, courses, classes, and educational institutions and services adequate to allow, for all Florida's students, the opportunity to obtain a high quality education…

Section 1000.01(3), Florida Statutes. Although Florida's School Districts are directly managed by their School Boards pursuant to power delegated to them by the State of Florida, the degree of control the State exercises over them is pervasive and substantial. The Florida K-20 Education Code includes chapters that apply to State and District level governance (Ch. 1001), student and parental rights and choices (Ch. 1002), accounting and auditing requirements (Ch. 1010), funding, planning and budgeting (Ch. 1011), personnel (Ch. 1012) and facilities (Ch. 1013).

Where a suit brought by a private party seeks to impose liability that must be paid with state funds, the suit is barred by the Eleventh Amendment. *Edelman*, 415 U.S. 651 at 662-63. State funds appropriated to finance Florida school districts for the 2014-15 fiscal year total $7,499,962,017.[13] State funds appropriated to finance Florida school districts for the 2015-16 fiscal year total $7,758,617,374.[14] Local funding comes almost entirely from property taxes levied in Florida's 67 counties, each of which constitutes a school district.[15] For the 2014-2015 fiscal year, for instance, 56.3% of school district funding statewide came from State funds.[16]

For the 2014-15 fiscal year, the Seminole County School District received 55.27% of its overall funding from the State of Florida. *See* Affidavit of Williamn C. Kelly, Jr. [DE30]. The School District's financials for the 2015-16 fiscal year will not be audited and verified until June of 2016. However the percentage of the total funding attributable to State funds varies little from year-to-year. Funds are distributed proportionally across the various uses to which district funds are put. Thus, if the Plaintiff in this case were successful in extracting damages from the School Board in this action, roughly 55.27%, a majority, of the damages paid by the School Board would consist of state funds.

---

[13] Florida Department of Education's 2014-15 Funding for Florida School Districts Statistical Report at p.2.
[14] Florida Department of Education's 2015-16 Funding for Florida School Districts Statistical Report at p.2.
[15] *Id.* at pp.2-3.
[16] *See generally* Florida Education Finance Program, Office of Funding and Financial Reporting 2014-15 Final Calculation, October 16, 2015.

Thus, because Plaintiff seeks by this action to collect damages a majority of which would consist of Florida State funds, this action is barred by the Eleventh Amendment. *Edelman*, 415 U.S. at 663-63.[17]  Plaintiff's motion should therefore be denied, and summary judgment entered in favor of the School District.   However, even if the court were to find that the TCPA applies to governmental entities, and that Defendant School Board is not entitled to Eleventh Amendment immunity, the Plaintiff's motion must fail on other substantive grounds.

### III. THE CALLPLUS+ SUBSTITUTE MANAGEMENT SYSTEM IS NOT AN AUTOMATIC TELEPHONE DIALING SYSTEM

#### A. The Callplus+ Substitute Management System does not fit the definition of an ATDS

The TCPA prohibits any person[18] from making:

> any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] …

> (iii) to any telephone number assigned to a … cellular telephone service … or any service for which the called party is charged for the call.

47 U.S.C. § 227(b)(1)(A).

---

[17] While there are reported decisions in which federal courts have found that Eleventh Amendment immunity did not extend to municipalities or school boards, these decisions general involve civil rights and anti-discrimination statutes the primary purpose of which is to govern the actions of governmental entities.  The undersigned has been unable to locate a single published decision specifically denying Eleventh Amendment immunity to a governmental entity in the context of the TCPA.  For instance, in *Campbell v. Gadsden County District School Board*, 534 F.2d 650 (5th Cir. 1976), the Fifth Circuit Court of Appeals held that a county school board was not protected by the Eleventh Amendment in an action brought against it under 42 U.S.C. §§ 1981 and 1983.  However that case is distinguishable, not only because it involved civil rights laws, but because Florida's district school boards were quite different in 1976, when the case was decided, compared to today.  Although the court in *Gadsden* made reference to "our analysis of the nature of Florida school boards," it did not set its analysis forth, in the opinion.  *Id* at 656.  It did, however, describe the standard that it applied as follows:

> Our post-Edelman cases involving actions for retrospective monetary relief against county school boards and similar entities have held that the Eleventh Amendment does not bar such awards so long as the entities sued are locally controlled, essentially local in character, and the funds to defray the award would not be derived primarily from the state treasury.

*Id*. (citations omitted).  These considerations basically mirror those discussed in *Grimshaw*, *supra*.  As discussed herein, Florida's school districts are now pervasively controlled by the State.  Florida's K-20 Education Code was enacted in 2003, long after *Gadsden* was decided.  Unlike in 1976, a majority of a Florida school district's funding now comes from the State, rather than from local sources.  As the analysis set forth in herein demonstrates, according to the *Gadsden* court's own test, if decided today the court would have found Eleventh Amendment immunity to apply.

[18] As discussed *supra*, Defendant School Board is not a "person" in this context.

The TCPA defines an ATDS as "equipment which has the capacity -- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The Ninth Circuit has held that the definition of an ATDS is "clear and unambiguous" and therefore the Court's analysis "begins" and "ends" with the statutory text. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951, 953 (9th Cir. 2009).

The CALLplus+ platform used by the School Board to place the alleged calls to Plaintiff does not involve use of an ATDS because it does not have the capacity to store or produce telephone numbers to be called using a random or sequential number generator, nor can it dial such numbers. *See* Affidavit of Thomas Reid Rickman, Jr., [DE 25], at para. 6. Indeed, the platform itself cannot generate any numbers, and is merely a software application that public schools use to place calls to specific telephone numbers provided by substitute teachers and inputted into the system, not phone numbers that are randomly or sequentially generated. *See id.* Nor does it have the capacity to place calls to random or sequentially generated numbers because a teacher or other school employee must input the times and dates that a substitute is needed and specifically designate the phone number(s) to be called, as well as the date(s) and time(s) the calls will be placed. *See id.* In sum, the platform used to place the calls does not involve use of an ATDS, and any calls placed by the School Board using the CALLplus+ platform therefore cannot be deemed to violate the TCPA.

Plaintiff attorneys in TCPA cases (including counsel of record in this case) have sought crippling statutory damages against defendants for simply communicating with their existing customers, parents of their students, or as in this case, their employees – all based on a footnote in a FCC declaratory ruling. In that ruling, the FCC suggests that an ATDS "covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *See In the Matter of Rules and Regulations Implementing the Telephone Consumer*

*Protection Act of 1991, SoundBite Communications, Inc.*, CG Docket No. 02-278, 27 FCC Rcd. 15391, 15392 n.5 (Nov. 26, 2012) (italics original). However, *SoundBite* involved the issue of "prior express consent," did <u>not</u> construe or apply the statutory definition of ATDS under 47 U.S.C. § 227(a)(1), and is not binding on this Court. Rather, *Satterfield* instructs that because the statutory definition of ATDS is "clear and unambiguous," deference to FCC guidance under *Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), would be inappropriate. *See Satterfield*, 569 F.3d at 951, 953 (stating that "'[the court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous'" and where "Congress spoke clearly, we need not look to the FCC's interpretations").

Following *Satterfield*, the term ATDS cannot be construed to apply to any system simply because it can be set up to automatically dial numbers from a stored list of cell phone numbers, which is unsupported by the plain terms of the statute. See 47 U.S.C. § 227(b)(1)(A); *see also Dominguez v. Yahoo! Inc.*, 2015 WL 6405811 at *3 (3rd Cir. 2015) (agreeing with district court's holding that statutory definition of ATDS includes requirement that system at issue have the capacity to randomly or sequentially generate numbers, and that "random or sequential" as used in the definition of ATDS refers to generation of the numbers rather than the manner in which they are dialed, but remanding for further proceedings).

The United States District Court, Southern District of California recently upheld this position and granted summary judgment dismissing a purported TCPA class action in *Marks v. Crunch San Diego*, 55 F. Supp. 3d. 1288, 2014 WL 5422976 (S.D. Cal. October 23, 2014). The *Crunch* court held that a web-based text messaging platform was not an ATDS because it did not generate random or sequential numbers. *Id*. The Court further held that finding liability under such a system based on the plaintiff's "potential capacity" theory would lead to an "absurd result" *Id*. at *5-6. ("It seems unlikely that Congress intended to subject such a wide swath of the population to a

law designed to combat unwanted and excessive telemarketing.") The *Crunch* court disregarded the plaintiff's attempt to rely on *SoundBite* by finding "the FCC does not have the statutory authority to change the TCPA's definition of an ATDS." *Id* at *4.

Moreover, the CALLplus+ system does not utilize a "list" of numbers. Each substitute teacher has a separate profile. The system searches through these profiles for substitutes meeting the specific criteria set-up for each teaching availability. In that sense, the CALLplus+ system is a step further removed from an "autodialer" than the system at issue in *Crunch*. This Court should follow the reasoning of *Crunch*, *Dominguez*, and the clear language of the TCPA, and deny Plaintiff's Motion for Summary Judgment because the School Board did not use an ATDS to place the calls in question to Plaintiff's phone.

### B. The CALLplus+ Substitute Management System requires human intervention

Even if this Court were to adopt Plaintiff's expanded extra-statutory definition of an ATDS, Plaintiff would still not be entitled to summary judgment because the calls at issue were sent only through human intervention. "[T]he capacity to dial numbers *without human intervention* is required" before any liability under the TCPA can apply. *See Glauser*, 2015 WL 475111, at *10 (N.D. Cal. February 4, 2015) (emphasis added).[19] *See also Legg v. Voice Media Group, Inc.*, 20 F. Supp. 3d 1370, 1375 (S.D. Fla. May 16, 2014) (in order to qualify as ATDS system must send messages without human intervention): 18 FCC Rcd. 14014, 14092 at para. 132 (2003) ("The basic function of such equipment [is] to dial numbers without human intervention"); 23 FCC Rcd. 559, 566 at para. 13 (2008); *see also* 27 FCC Rcd. 15391, 15392 n.5 (2012).

---

[19] Regarding the statutory requirement that an ATDS include the capacity to randomly or sequentially generate numbers, the *Glauser* court disregarded the clear statutory language in deference to the FCC's extra-statutory expanded definition of an ATDS pursuant to the Hobbs Act (28 U.S.C. § 2342(1)). However, such deference to the FCC under the Hobbs Act is improper in this instance. "[The court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous…[where] Congress spoke clearly, we need not look to the FCC's interpretations." *Satterfield*, 569 F.3d at 951, 953; *see also Marks v. Crunch*, 2014 WL 5422976 at *2 ("the FCC does not have the statutory authority to change the TCPA's definition of an ATDS…[unlike Section 227(b)], Section 227(a) [of the TCPA] does not include a provision giving the FCC rulemaking authority."). Thus, the FCC is not authorized to alter the definitions clearly set forth in the TCPA, including the definition of an ATDS.

In *Glauser*, the text messages at issue were triggered only after an individual obtained the recipient's telephone numbers and added them to a specific contact group. The system used by Defendant GroupMe to send such text messages required human intervention and was therefore not an ATDS, warranting summary judgment in the defendant's favor. *Id.* At *11.

Similarly, the court dismissed all claims alleged against Defendant WhisperText on similar grounds in *McKenna v. WhisperText*, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015). The *WhisperText* order confirmed that no TCPA liability can apply where a platform sends text messages "only at the user's affirmative direction to recipients selected by the user." *Id.* at *8. "Under such circumstances, the action taken is with human intervention – *disqualifying the equipment at issue as any kind of ATDS*." *Id.* (emphasis added). Even the mere act of uploading customer telephone numbers to a database requires "human curation and intervention," thus defeating liability under the TCPA. *Id.* at *10-11, citing *Marks v. Crunch*, 55 F. Supp. 3d 1288, 2014 WL 5422976 at *3 (S.D. Ca. Oct. 23, 2014).

This Court should reach a similar outcome. Here, the intended recipient of the calls in question was an employee of the School District who had provided her telephone number specifically in order to be contacted by particular schools in the Seminole County School District with calls such as those at issue in this case. At each stage of the process prior to Plaintiff's receipt of the calls at issue, from the actual collection of the employee's phone number, manual entry of the employee's preferences regarding times to be called, manual entry of the employee's profile, including her contact phone number, into the CALLplus+ system, manual entry of the information regarding each individual substitute teaching opportunity, manually releasing the message for the CALLplus+ system to begin placing the calls, and actual acceptance of a job by a contacted substitute, "human intervention" was involved at every step. For instance, Thomas Reid Rickman, Jr., the designer of the CALLplus+ Substitute Management System software used by Seminole

County Schools, testified during his October 9, 2015 deposition [DE 23-11, 23-12 and 23-13] that if

a given substitute accepted a job:

> Then it would go through and say – It asks them to confirm it. It gives them one last chance to get out of it. It says you agree to sub for Jane Doe on this date at this time at this school. They confirm it by pressing the touchtone key. I think it's a one. And then if the teacher has left a message, that message would play to the subs. Like, you know, we're having field day tomorrow. Please meet at the library instead of meeting at the classroom. As well as the administrator can have a message on there as well that plays out to the substitutes that agree to come in.

Deposition of Thomas Reid Rickman, Jr., October 9, 2015, DE 23-11, at 20:9-21. Regarding how

substitute teacher contact information was put into the system, Mr. Rickman testified as follows:

> So in the sub records, the subs can have up to two phone numbers, a primary and an alternate. The subs can also tell the school what times they want to be called. So let's say you go to bed at ten, but I go to bed at nine. So you may want CALLplus+ to notify you of jobs until ten, but I want mine to stop at nine. So there's all kinds of custom settings in there that the substitutes can set up within their profile. However, someone at the school, since it's a site-based PC-based solution, someone at the school actually has to make those changes.

*Id*. at 26:12-23. Regarding the preferences and selections that must be made regarding the calls,

Mr. Rickman testified that:

> [I]t gets pretty complex in the sense that the schools can toggle the selection. What we're trying to do is get the best sub in there, if at all possible. So teachers have preferred subs. Teachers have excluded subs. The school has a priority list. We also have sub types, where a retired English teacher could be matched up with a retired English sub. Trying to get the best sub in for the job.
>
> So what it does is it goes through, it looks through the teacher's preferred list. If Jane Doe was number one there, it would call her. If she wasn't there or didn't get a positive response, it would go to the second preferred sub, if they had one. Then it goes to sub types and would try to find that type sub. And then it would go to the school's priority list, which they can rank from one to 999. And to further complicate that more, you can have more than one of the same priority number.

*Id*. at 28:4-22. He further explained:

> Q.        How many telephone numbers could be stored on the -- I'll just call it the master list, of telephone numbers, that could be called using the system?
>
> A.        I don't think we have a master list, because each individual sub has its own record. So, I mean, you can put in as many subs as you wanted. Obviously,

practically you're only going to be able to call so many. Typically most schools would not put in the entire sub list. They would put in the subs that like to come to their schools. The sub list for any district is huge. And there's a lot of subs that only come to certain schools.

  So typical installation of a CALLplus+ the way they would set it up, they would put in – they would have, you know, one to ten subs that they used all the time. And then they would have maybe ten or 20 more that would -- had agreed to come work at that school. So I would say most schools have less than 50 to 100 subs in their system.

Q. And those 50 to 100 subs, are they pulled from a larger list?

A. They are not. There's no interface in or out of CALLplus+. It all has to be keyed in by someone at the school. And it has to be put in. There's no way to even type in the numbers in a master list. It has to be put in by creating the sub record and going into each individual record. So the maximum number you could put in at a time would be two.

*Id*. at 35:24-35, 36:1-25, 37:1-3. And with regard to the purpose and operation of the system, Mr.

Rickman explained:

I don't think it allows -- I don't think it does it any faster than it would with a person manually calling. But it does keep someone from -- at the school from having to do that in the evening hours and early morning hours. Rather -- If it's a principal or assistant principal, bookkeeper, whoever it would be, it keeps them from having to do that. And there is some advantages as well for the teachers. If they get sick at two in the morning, then they can go ahead and call the system, as opposed to they're at the emergency room with their kid at two in the morning, they can't really call their principal or their assistant principal and say, hey, I'm at the emergency room. They have to wait until five or six in the morning until that person is awake. This system allows for them to call in whenever throughout the night so that they can best handle the situation that they have.

*Id*. at 47:25, 48:1-17. *See also* Affidavit of Thomas Reid Rickman, Jr., DE 25, paras. 4, 7-10, 12,

13, *supra*.

 Indeed, this level of human intervention at multiple stages of the call placing process goes far

further than the relatively small intervention found to prohibit TCPA liability under both *Glauser*

and *WhisperText*. Thus, because human intervention is involved in multiple aspects of placing a

call using the CALLplus+ Substitute Management System, Plaintiff's motion should be denied, and

summary judgment entered in favor of the School Board.

IV. **THE CALLPLUS+ SUBSTITUTE MANAGEMENT SYSTEM DOES NOT PLACE ARTIFICIAL VOICE OR PRERECORDED VOICE MESSAGE CALLS**

A. **The CALLplus+ Substitute Management System does not utilize an artificial voice**

The CALLplus+ Substitute Management System used by schools within the Seminole County School District prompts call recipients using a real human voice prompts provided with the software. There is no use of an artificial or computer generated voice, nor does CALLplus+ have the capability to utilize an artificial or computer generated voice. As Thomas Reid Rickman, Jr., the designer of the CALLplus+ Substitute Management System software used by Seminole County Schools explains, the voice prompts and initial identifying greeting heard by a call recipient consist "[n]ot [of] a digitized voice, but an actual human voice." Deposition of Thomas Reid Rickman, Jr., October 9, 2015, DE 23-11, at 19:4-5.

B. **The CALLplus+ Substitute Management System does not place prerecorded voice message calls**

The CALLplus+ Substitute Management System utilizes "canned" human voice prompts to identify the school calling and guide the substitute teacher called through the necessary interactive keyboard inputs for the substitute teacher to accept or reject an available teaching assignment. Although the human voice that guides a called substitute through the process is a recorded voice, rather than a live human, this is not what is contemplated by the term "prerecorded voice" in the context of the TCPA. Discussing this aspect of the TCPA, the FCC speaks in terms not of mere voice prompts, but of "prerecorded voice message calls." *See, e.g.* 23 FCC Rcd.559, 565 (December 28, 2007) ("To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and *prerecorded message calls*, we conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent." (emphasis supplied)); *Moore v. Firstsource Advantage, LLC*, 2011 WL 4345703 at *10 (W.D. N.Y. September 15, 2011).

As noted previously herein, the CALLplus+ Substitute Management System does not have the capability to leave prerecorded voice messages. The system's only capability to interact with a human call recipient using voice prompts. The system does not include the ability to recognize whether a person or a machine has answered a given call, and occasionally some portion of the voice prompts will be recorded by a recipient's answering machine or voice mail. But no prerecorded messages are left. Mere voice prompts are not what the TCPA contemplates when it restricts calls using an "artificial or prerecorded voice." At a minimum, a fact question exists as to whether the CALLplus+ system's use of human voice prompts constitutes use of a "prerecorded voice" within the meaning of the TCPA, and Plaintiff's motion on these grounds should be denied.

## V. THE SCHOOL BOARD DID NOT "WILLINGLY OR KNOWINGLY" VIOLATE THE TCPA

As Plaintiff notes in his motion, enhanced damages are available only "[i]f the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection." 47 U.S.C. § 227(b)(3)(B)  However, in his motion Plaintiff misinterprets this provision. Plaintiff's asserts that "if the Court determines that Defendant's autodialer calls made after October 22, 2013…were made willfully or knowingly by Defendant, then this Court may treble the monetary or statutory damages," [DE 22, p.20]  However, it is not the willful or knowing performance of the act alleged to violate the TCPA that triggers the Court's authority to enhance damages, but the willful or knowing violation of the statute. In other words, in order for enhanced damages to be available, a defendant must have undertaken the act alleged to violate the TCPA knowing that the act violates the TCPA. *See, e.g. Adamcik v. Credit Card Control Servs., Inc.*, 832 F. Supp. 2d 744, 754 (W.D. Tex. 2011) (trebling of damages not warranted where no evidence supported finding of anything more than negligence – no evidence that the defendant knew or should have known that it was violating the TCPA); *Manufacturers Auto Leasing, Inc. v.*

*Autoflex Leasing, Inc.*, 139 S.W. 3d 342, 346 (Tex. App. 2004) ("the TCPA is willfully or knowingly violated when the defendant knows of the TCPA's prohibitions, knows he does not have permission to send a fax ad to the plaintiff, and sends it anyway.") (citing *State v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001). *Lary v. Trinity Physician Financial & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015), cited by the Plaintiff, is consistent with the foregoing cases, although the language used in that case is less direct. In *Lary*, the court stated the rule as follows:

> For example, to violate section 227(b)(1)(A)(i), a defendant must know that he is using an "automatic telephone dialing system" to place a "call," and that the call is directed toward an "emergency" line.

*Lary*, 780 F.3d at 1107 (citations omitted). It is significant that the court in *Lary* stated that the defendant must know that it is using an ATDS. An ATDS is a specifically defined system, and the definition of ATDS in the TCPA is anything but straightforward – certainly not what a lay person lacking knowledge of the TCPA would assume the term means. Accordingly, implied in the *Lary* court's statement of the standard is that a defendant must be aware at least to a certain degree of the TCPA and its restrictions. This is further reinforced by the *Lary* court in the sentences immediately following:

> If we interpreted the statute to require only that the violator knew he was making a "call" or sending a fax, the statute would have almost no room for violations that are not "willful [ ] or knowing[ ]." *See Harris v. World Fin. Network Nat'l Bank*, 867 F.Supp.2d 888, 895 (E.D.Mich.2012) ("Such a broad application of 'willful [ ]' or 'knowing' would significantly diminish the statute's distinction between violations that do not require an intent, and those willful[ ] and knowing violations that [C]ongress intended to punish more severely.").

*Id*. There is no record evidence in this case that the School Board placed any calls to Plaintiff's phone with knowledge that the calls would violate the TCPA, or with intent to violate the TCPA. In fact, the only evidence pertaining to this issue demonstrates that there was neither intent to violate the TCPA, or any law, nor knowledge that the TCPA had any application to calls from a school

intended to inform a School District employee of work opportunities. When asked during his deposition as the designated representative of the School Board whether any part of the School Board's training of employees to use the CALLplus+ Substitute Management System includes compliance with the TCPA, Joseph Harper testified that while the School Board complies with all applicable laws, the CALLplus+ system was not considered to be "a consumer product to contact customers." Deposition of Joseph Harper., August 3, 2015, DE 23-14, at 61:20-21. Because the School Board did not consider the CALLplus+ Substitute Management System to fall within the ambit of the TCPA, a law designed to combat intrusive telemarketing, no part of the training of employees to use the CALLplus+ system pertains to compliance with the TCPA. *Id*. at 61:23-25, 62:1. Likewise, there is no record evidence that Plaintiff, during the October 22, 2013 conversation he alleges having with a School District employee, made any reference to the TCPA. Moreover, there is no record evidence that the School Board believed that it was using an ATDS, or that it even knew what an ATDS, as defined by the TCPA, was, and it is clear that the School Board believed that it had consent to place the calls because the calls were placed to a number provided for that purpose by an employee.

Because the only record evidence on the issue demonstrates that, even if any of the calls at issue actually violated the TCPA, they were not placed with knowledge that they violated the TCPA nor with the intent to willfully violate the TCPA, and because there is no record evidence that the School Board knew what an ATDS was or believed that it was using one, there is no basis for enhancing any damages awarded in this case. Moreover, even if Plaintiff's assertion that merely placing a call after allegedly being informed that the number being called was incorrect is sufficient to constitute a "willful or knowing" violation, Plaintiff has at best raises a question of fact on the issue. *Pollock v. Bay Area Credit Serv., LLC*, 2009 WL 2475167 (S.D. Fla. Aug. 13, 2009) (whether TCPA violations are knowing or willful is a jury question). The School District has no

18

record that it was informed that it was calling an incorrect number prior to being served with Plaintiff's Notice of Claim in August of 2014. Plaintiff's motion should accordingly be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment as to Count I of the Complaint should be denied. Because Defendant School Board is not a "person" and therefore not subject to liability under the TCPA, and is immune from suit in federal courts pursuant to the Eleventh Amendment, judgment should be entered in its favor as to this entire action. Multiple questions of fact also exist that preclude entry of summary judgment for Plaintiff as to both liability and damages. Defendant's CALLplus+ system cannot be an ATDS because it does not have the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and because human intervention is required in order to place calls. It is undisputed that the system does not use an artificial voice. At a minimum, a question of fact exists whether the voice prompts utilized by the system render calls made using the system "prerecorded voice message calls". Multiple questions remain regarding damages as well. The number of calls placed, and whether Defendant School Board "willingly or knowingly" violated the TCPA by placing any of the calls at issue are disputed. Additionally, it is in the discretion of the Court whether enhance damages. Issues exist pertaining to the equities involved in a plaintiff allowing calls to accumulate while he catalogues them in order to increase his damages in a future lawsuit, particularly once that plaintiff has spoken to counsel and is well aware that he will be filing a suit at some point, when he has accumulated sufficient potential damages to offset a contingency attorney fee. For the foregoing reasons, Defendant Seminole County School Board respectfully requests the Court to deny Plaintiff's Motion in its entirety, to grant judgment in its favor, and to grant such further relief as the Court may deem just and appropriate under the circumstances.

Respectfully submitted,

s/ Timothy N. Bench
_____
FRANCIS H. SHEPPARD, ESQUIRE
Florida Bar No. 0442290
E-mail: FSheppard@rumberger.com
TIMOTHY N. BENCH, ESQUIRE
Florida Bar No. 0098426
E-mail: TBench@rumberger.com
RUMBERGER, KIRK & CALDWELL
A Professional Association
Post Office Box 1873
Orlando, Florida 32802-1873
Telephone: (407) 872-7300
Telecopier: (407) 841-2133
**Attorneys for Defendant, Seminole County
School Board**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 23, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Michael J. Vitoria, Esquire** at MVitoria@ForThePeople.com; afloyd@forthepeople.com; kreynolds@forthepeople.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: **None.**

s/ Timothy N. Bench
_____
FRANCIS H. SHEPPARD, ESQUIRE
Florida Bar No. 0442290
TIMOTHY N. BENCH, ESQUIRE
Florida Bar No. 0098426
RUMBERGER, KIRK & CALDWELL, P.A.
Post Office Box 1873
Orlando, Florida 32802-1873
Telephone: (407) 872-7300
Telecopier: (407) 841-2133
**Attorneys for Defendant**